We'll hear Truenorth Capital versus Hitachi Metals. Good morning. Good morning. May it please the Court. Lawrence Segan for Appellants Truenorth and TNCP. Hitachi Metals America, or HMA, signed an agreement to pay a completion fee to Truenorth upon the acquisition of any selected target by HMA, its affiliates, or subsidiaries during the term or a 12-month tail period. The selected targets were to be agreed in writing, and Truenorth was only permitted to solicit the selected targets for an acquisition. The selected targets were put on a list that was designated the Tier 1 list, to be distinguished from the Tier 2 list. How does the parent become part of this, though, Hitachi Metals Limited? If you just read the language about it, it's Hitachi Metals America, LLC, its subsidiaries. But how does the parent become a signatory to that agreement? Because the agreement specifically says that the affiliate, if an affiliate of HMA, Hitachi Metals America, acquires a selected target, then HMA is liable for the fee. If you're talking about jurisdiction, that's another question. No, just about who's bound by this agreement. Why would the parent be bound by the agreement? Well, under principles of agency, it's not uncommon for a non-signatory to be held liable. And there is plenty of evidence showing that HMA was acting at the direction and control of its parent company, Hitachi Metals Limited. HML eventually quashed the one deal that the parties worked on the most. And along the way, they were dictating things like personnel decisions and terms of a supply agreement that was being negotiated. So the president of HMA made it clear to True North, and we have writings to that effect, that everything they did was subject to the direction and control of the parent company, HML. But your agreement is with HMA? Correct. And from whom are you seeking this payment? Well, at the very least from HMA, the signatory. Right. Does it really matter? I mean, so long as the parent company is an affiliate, its actions in acquiring the property or the entity bind HMA by its – sorry, bind – HMA is the one we're talking about, right? HMA is the signatory. Is America. Hitachi Metals – Bind HMA regardless, right? Because HMA agreed to that. I'm sorry. I don't understand the question. The parent company you're saying is an affiliate. Yes. I just want to make sure I have this right in my head. An affiliate. Now, the affiliate goes out and under the terms here acquired the company. Correct. Right? But HMA, the American company, agreed that if its affiliate went out and did that, HMA would pay. So you're not looking for money from the parent company. You're looking for money from HMA. Primarily, we do believe, yes, HMA is primarily liable. It's not out of the question that HML would be liable as well. As I said under principles of – That's not before us at this point, right? Oh, it is. Whether HML is liable? Well, because there are two decisions basically that are being appealed. One has to do with the grant of summary judgment in favor of HMA. The other is the jurisdictional question. Yes. Okay. Sorry. I got that. So just to follow up on Judge Hall's question, it says affiliates including but not limited to Attaché Metals Automotive Components USA LLC, which as I understand it was a subsidiary of HMA. Would it have made sense to mention the parent by name then too? If the intention of the parties was to bind the parent? Well, it would have certainly made things simpler. Which has 110. Yes. I think it has 110 subsidiaries or affiliates. The parent does, right? Well, no, that's not correct. That was a misstatement. How many then? How many affiliates does HMA have? I'm not sure. HML. HML? Yes. No, but HML is not the question here. The question is who are the affiliates of HMA? Yes, but it's HML that entered into the deal ultimately, right? Correct. But HMA is obligated if an affiliate of HMA acquires a selected target. The only investment that is subject to this agreement is one that is made by the company, correct? Correct. And the company is a defined term. Correct. And that is HMA, right? HMA, its affiliates, and subsidiaries. Well, just a second. There's a sentence that says, in defining what the company is, it said, for the avoidance of doubt, the term company, HMA, shall include subsidiaries or affiliated companies formed by the company to complete or participate in an investment. That is to say, basically, an investment vehicle. Special purpose entity. But the parent is not created by the subsidiary for the purpose of entering into the transaction. Am I correct? Let's look at that language. Am I correct? The parent is not a special purpose entity, but let's look at the language. Correct. For the avoidance of doubt clause expands the definition of company. It does not narrow the definition of affiliate. It specifically says formed by the company. The company is defined as HMA, its affiliates, and subsidiaries. So if any of the entities, if HMA, its affiliate or subsidiaries, including HMAC and HML, formed a special purpose entity, that entity, too, was included in the definition of company. And the reason this is included is I thought it was very smart. The phrase formed by the company to complete or participate in an investment modifies the term affiliated companies and may very well modify the term subsidiaries as well. Oh, I think that's an erroneous reading. And what you're doing is you have a circular definition of everything. Everything is a subsidiary of everything. No, I think that's an erroneous reading. The purpose of this was because under the Ellington v. EMI case, a future affiliate is not included in the definition of affiliate unless the agreement specifically says so. Right. Right. So what you're saying is the word affiliate no longer includes any other affiliates than special purpose entities, and that can't possibly be the case. Oh, but it does because it lists affiliates expressly. And, in fact, You're saying the for the avoidance of doubt clause lists? No. The avoidance of doubt clause follows another clause that does list expressly a number of affiliates.  It was intended to broaden, not narrow, because the for the avoidance of doubt clause has two components. One, it expands company to include future affiliates, future affiliates. It also expands selected target to include all entities or affiliated companies that are acquired with the selected target. It was an expansionary clause. It was not intended to narrow the definition of affiliate. It says nothing like that. I believe Your Honor is mistaken, with all due respect. I've done that before. Go right ahead. Well, WAPACA foundry was on the tier one list. If I didn't say this, the selected targets were designated tier one. The tier two lists. How many were on the tier one list, then? The tier one list was 22, including WAPACA, which is the disputed one. The tier two list had about 45, which That was on the list that Mr. Guida sent in his March 6th email? No, WAPACA was not. It was added later after a conversation between Mr. Guida and True North. I'm sorry. There's a sentence on page 18 of your adversary's brief, and it says, WAPACA never appeared in any version of True North's call log spreadsheets on any tab titled target list. Is that correct? First of all, they were not call logs. That's a fabrication. There was no testimony or evidence. Did the name WAPACA appear on any list titled target list? It appeared in the target column. The tier one lists were Excel spreadsheets. If you're familiar with the software, they have various tabs. The initial list was on the tab one. All the subsequent tabs had only included WAPACA. They are correct that it wasn't written on the first tab. But once they got to version three What was the first tab titled? Target, I believe. Targets. So WAPACA never appeared on a list titled target? It appeared on the tier one list, which were the selected targets. And that was the working list. When was that generated? Sorry? When was the tier one list generated? It was not in the initial communication. It was immediately following Mr. Guyde's email of March 6th. The parties, True North, researched the facilities, came up with a selected target list, and it was labeled tier one. Again, these are the ones that they were authorized to solicit. So, you know, that objection, by the way, is missing the forest for the trees. And I'm not criticizing Your Honor. I'm criticizing the argument raised by Hitachi. Because version three was the final selected target list, followed by version four. Version three was a single tab. Where did the defendants sign off on version three? Okay, this is where we Not with a signature. Not with a signature. But essentially agreed that version three was the list. Okay. What we have here is we have to apply the principles of the case of Crabtree versus Elizabeth Arden, which held the 1953 New York Court of Appeals case, which held that a group of writings, when taken together, may constitute a writing, a written agreement, provided one of them is signed. When you look at all the writings together, they do establish an agreement. You do not, under Crabtree versus Elizabeth Arden, parole evidence is admissible to connect the documents, to show the circumstances, and to prove that the party to be charged assented or acquiesced to the unsigned document. What's the proof of the acquiescence? Okay. We have an e-mail of April 7, 2012, sent by the president of HMA, circulating the tier one list, version three with WAPACA internally. He never did that with any other list. But every reference to WAPACA that I saw said it's not worth pursuing. That's true. Why would that move then to a selected targets list if the few references to WAPACA have notations saying they're already in negotiations with someone else, they told us to forget it? Well, there were four other targets that were similar, and they were all selected targets. So why would only WAPACA be the one deemed not to be a selected target because it was inactive? This was an exclusive agreement. Maybe because it was never on a list called selected targets. That may be a question of fact, but I don't think it's a genuine issue of fact. I think there's no question that you can't infer that WAPACA was a selected target because it was one of five that were inactive. The proper inference would be too late. It wasn't on the first list. But inactive targets can become active. That's the whole point, and that's exactly what happened here. And it happened several times during the course of these parties' dealings together. Why did it become active? I mean, if it was too late because somebody else was already bidding for it and that entity bought it, then it was too late, and it never became anything but too late. Well, that's not true. It obviously became active during the tail period when HML went and acquired it without telling True North. Let's also understand that from the beginning HMA went behind True North's back and started meeting with WAPACA, held secret meetings with WAPACA, and Grady, which was an undisputed selected target. We are dealing here with a contract. You have referred to what's called the Version 3. Version 3, correct. And that is a spreadsheet that was called comments, right? No, the spreadsheet was called Tier 1. The tab was titled comments, but the spreadsheet was titled Tier 1. And that's the big distinction. The district court inferred all kinds of facts in favor of HMA. And the piece of paper that had Tier 1 at the top had WAPACA on it. Yes. After it had been added, though. Added to the original list that had been sent by Hitachi. Yes, it had been added. It wasn't part of the initial list. It was added after a conversation between Mr. Geide, and he admitted. After a conversation. That's not a writing. Of course it's not a writing. But neither is Mr. Geide's initial email of March 6, 2012. It was added as don't think about it because it's too late. Why is it? It says does not seem likely. Does not seem likely. Likely does not mean it's not a selected target. As I said, there were four others. So if any of the other four had become active during the tail period, HML had acquired one of those. Wouldn't True North be entitled to the completion fee? Yes. So why would WAPACA be treated any differently? We're just asking that the agreement be interpreted consistently because what the district court did here was it actually found, essentially found that all the names on version 3 and version 4 of the tier 1 list were selected targets except WAPACA. And I don't think any jury would ever believe that. Okay. You've reserved rebuttal. Thank you. Good morning. Thank you, Your Honors. May it please the Court. I'm David Salmons on behalf of Hitachi Metals America, or HMA, and the other defendants' appellees. I'll seek to be brief. Unless the Court has questions, I'll try to make this quick. The district court rightly held that this case can be resolved based on the plain language of the contract. That language limited the completion fee to investments in selected targets. And because of language added by HMA to try to avoid this very dispute, it expressly required that a target can only become a selected target eligible for the fee if HMA agreed in writing to make it one. Here's what we know about the agreed to selected targets, and this comes directly from True North's opening brief on page 5. So everything I'm saying is undisputed. On March 6, 2012, the day after HMA signed the contract, officials from True North and HMA met to discuss targets. Based on True North's own description, two important things happened at that initial meeting. First, True North provided HMA with a list of nearly 200 what it calls potential selected targets, and WIPACA was included on True North's list of potentials. Second, during that meeting, the president of HMA, Mr. Kubota, stated that Pete Geide would take the lead for HMA in identifying selected targets so everyone understood that HMA's list of selected targets would come from Mr. Geide. Later that same day, after the meeting had concluded, Mr. Geide sent an e-mail to True North copying Mr. Kubota and others at HMA, stating, quote, here is the list. And he listed 22 companies, and WIPACA was not among them. We do have all that. You know, you could stand here for 25 minutes laying out these facts. They're very complicated and they're very extensive. You said in your brief that WIPACA never appeared in any version of True North's call log spreadsheets on any tab titled target list. What difference does that make when the issue really is, is it a selected target? Yes, Your Honor. So if something doesn't appear on the target list, but True North puts it on a tier one list or a selected target list because it just arose, why put it on the target list if it really gets promoted to being on the selected target list or tier one, which I understand is the same thing. It's not the same thing, Your Honor, and that's the confusion. We were responding, that point of the brief, we were responding to an argument made by the opponent. What is a tier one list? The tier one is True North's nomenclature. It's not language from the contract and it's not language that HMA ever used, and every HMA witness disavowed it. It was True North's way of characterizing their work. What the agreement says is that HMA has to agree in writing for a company to become a selected target. The only writing in which HMA agrees to any entities as selected targets is that e-mail I was just describing, Your Honor, from Mr. Geide sent on March 6th that says here is the list on behalf of HMA. That has 22 companies and WPACA is not on them. Can I ask you about that, just a technical question? Yes. There's references to 2070B and 2013B for the various companies. What did that mean? This was the focus of the company's desire to – those are specific lines of de-sematic equipment. De-sematic equipment allows for fast sand casting of metal, and those are particular lines, production lines of de-sematic equipment, and they were looking for facilities that had those specific lines, and that was all they were looking for. So the point, Your Honor, with my reciting this fact is that the only thing that is in this record that represents any writing by HMA identifying selected targets is that March 6th e-mail from Mr. Geide. Let's turn to version 3. Your brief said that this spreadsheet, which was sent by True North, included only one tab titled comments, which I took to mean that there was no tab, or at least no list, that was headed tier 1 or selected targets. Is that correct? So I think on version 3 – Version 3 consisted, according to your brief, of nothing but comments. I believe that's correct. I think the version 3 that was e-mailed did not have on it the – if I could just take one minute and give us a little background. Go ahead. I'm just trying to figure out what happened here. Sure. So HMA sends this list that says here's the list. It's on March 6th. What happens then is True North says thank you. They put it into a spreadsheet, and they send it back on March 15th, and everyone agrees that that represents an agreement by both sides as to what are the selected targets. At that time, WPACA is not on the list. What happens after that – Because Mr. Gotti has sent the list that they want. Correct. That's right. What happens after that is True North begins making phone calls and contacts, and it captures the information that it obtains from those contacts into a spreadsheet. Most of the spreadsheets that they sent had two tabs, one labeled targets and one that said comments, and I think there was one that had a third that said unlikely. WPACA never appeared in any of their own spreadsheets that had on a tab that said targets. It appeared only under comments or unlikely, and every time it appeared, it had the language that your honors have referenced that says no point in going down this road. It's not going to happen. The 22 targets stayed the way they were. I think it was actually 21. I think one disappeared from the list. Well, what happened – I can answer that, Your Honor, if you would like. I don't need an answer to that question. Okay. Sorry. My question is then why were there conversations about companies other than those 21 targets with references in these other documents, forgetting about whether they moved to the selected target list, but why was True North calling up WASA if it wasn't on the list? Well, it contacted WPACA like it contacted every other company that was on what they call their tier two list. Everyone agrees those were not selected targets. They contacted every one of them to find out information because there's always the potential that the parties could agree to add another company to the list. If none of the ones on the selected target list pans out, they could go to another one. But in order for that to happen, there has to be an agreement in writing. Is there a distinction between tier one and tier two or between selected targets and targets, between companies to which True North could identify Hitachi and those to which it could simply indicate whether they're available for sale without mentioning the client? There was lots of information that was being gathered and shared back and forth. I didn't ask that, actually.  I'm sorry, Your Honor. Is there a distinction between selected targets and targets based on the idea that only with selected targets could True North identify Hitachi as the entity it is working for? No, Your Honor. What the contract says is that when WMA agrees to put an entity, designate an entity as a selected target, that authorizes the company to make contact and reveal the identity of HMA. But that doesn't mean that those are the only entities where that can happen. And it says that they can't contact any of the targets without our approval first. And so the designation as a selected target necessarily implies they can make contact and share some information. That's in the agreement. Judge, does the record reflect whether WAPACA was told that Hitachi is the company that True North was representing? I'm sorry. Does the record show whether WAPACA was told by True North that Hitachi is the company that True North was representing? There is a declaration from Mr. Rossetti of True North that he did. That's the only information specifically to that. And there hasn't really been further discovery around that. So that is in there. That's their statement. Of course, HMA has no way to know whether that's true or not. But what is true and what is clear is that in order for an entity to become a selected target eligible for the fee, the contract requires that HMA agree in writing. And merely receiving passively some documents that contains call information from the other party can't possibly satisfy that requirement that we agree in writing to make them a designated selected target. Yes, but according to your argument, if True North had contacted WAPACA and it wasn't on the list and WAPACA said, gee, that's great, you know, we're for sale, and Hitachi had bought it, you still wouldn't pay them because WAPACA would not have been added in writing, mutually agreed to by the parties under the contract. Am I correct? I think two things could happen in that circumstance, Your Honor. One is the parties could agree to add them to the list in writing. I understand that. And if they did, then it would be covered. If not, then you're right. They would not be paid. And I believe in their brief, True North says the same thing. They said that if there was an entity that was not designated as a selected target that ended up on the tier two list that we purchased, they would not be entitled to the fee. So I think it follows. So the fact that WAPACA is listed, this is at CA-283, version three as a target in column B means nothing? Well, it means that in the way True North was processing its own information about its calls and sharing information about their calls, in their spreadsheet, they had a comments column that had WAPACA listed as a — They had a target list column, which at least to me doesn't say new targets or old targets or designated targets or anything else. It's just got a whole list of targets. I think the language could be a little confusing. Let me try to be clear what I'm talking about. We don't think that anything that comes to us from their spreadsheet, no matter what it is, can constitute an agreement in writing by HMA to make them a selected target. There has to be something in writing from HMA doing that, and there's nothing. And the only thing that does exist is that initial email, which everyone agrees created a list of selected targets that we agreed to, and WAPACA's not on it. The spreadsheets they sent us had multiple tabs. Your client received version three, though, right? Yes, and version four as well. And version four had the two tabs. One said targets, one said comments. Targets only had the original list that Mr. Giety sent. Comments had the addition of WAPACA on it and said in red, it was highlighted in red, no point going down this road. This isn't happening. But there were some companies that were selected targets on that list, too. Yes, of course. Essentially, it was their reporting on the companies they had called, and they put WAPACA on their list that they labeled Tier 1. Tier 1 is never a term anyone at HMA ever used or communicated, and there's no agreement in writing conveyed from HMA to TrueNorth that has WAPACA on any list designated as a selected target. We think that's enough to decide this case. We also have these other arguments that we've made about how the parents are not included in the contractual term of affiliate, and also with regard to the substantive New York law about procuring cause that we think also applies in this case. And the district court didn't reach those issues because it did it on a jurisdictional ground. It did not. It ordered to do it on a jurisdictional ground. Yes, it did not reach the procuring cause. There is a footnote at the end of the district court's brief, which is perhaps a little cryptic, but it does seem to resolve and grant summary judgment that the contract does not authorize reaching the parents. That's footnote 11. The bottom line is this. HMA insisted upon an agree-in-writing requirement before a company could become a selected target eligible for the completion fee. It acted at all times consistent with that requirement. There's no waiver here. In the definition of the company, it says that it includes, well, actually it refers to Hitachi Metals America. It's subsidiaries and affiliates. Yes, Your Honor. Now, the following sentence makes clear that the term affiliates includes essentially vehicles, acquisition vehicles. Why does that narrow the use of the word affiliates in the prior sentence? Well, I think what it does is it makes clear that what I would argue is the natural reading of that term, that, in other words, I think everyone understands what a subsidiary is. That's a company that's below the company that's designated. Yes, but we're talking about affiliates. That's wholly or majority owned by that. Yes. An affiliate is another company that is... Affiliated. Affiliated, but not... That would include a parent. With respect, we don't think so, Your Honor. And we've cited dictionaries and other authorities for the proposition that the term affiliate is distinct from parent. Why don't you say that a parent company is affiliated with its subsidiary? There's certainly a notion in which that language is used. Well, yes or no. I mean, if you referred to a company and you said it had a subsidiary, wouldn't you say that that subsidiary was an affiliate of the parent? I think you could say that the subsidiary is an affiliate of the parent. I don't think you would say the parent is an affiliate of the subsidiary. It's very odd to have family relationships that, like, go one way but don't go back the other way. Well, I think especially when you read this language in total and you look at all of the ways in which the definition of company plays out here, what you have, and it's clear, first of all, that the focus here is on HMA, which is a relatively small U.S. subsidiary. And the only specific affiliate that's referenced is HMAC, which, again, is a subsidiary of it. And then the reference to affiliate comes up again. I'm inclined to agree that it would make very little sense to include all affiliates because that would be the big company would be a large number of companies. Over 1,100. Yeah, and that's where I started out. But I think your adversary has a good argument that that's the word that's used, and if it includes hundreds of companies, it includes hundreds of companies. It's not like you lack counsel to draft. We certainly did not lack counsel to draft, Your Honor, nor did they. We cited on pages 49 and 50 of our brief lots of dictionaries that define affiliate as distinct from parent. They knew that HMA had a parent. They knew it had a subsidiary in HMAC. The only example included as to affiliated companies is HMAC, which is a subordinate. It's a subsidiary. And then when they clarified, in the language Your Honors have already pointed to, for avoidance of doubt, they used the reference of affiliated companies to refer again to companies that would be controlled to some degree by HMA. And that's, we think, the most natural reading of affiliate on the plain language of this agreement, that it's companies that are either subsidiaries, meaning they're wholly or majority owned by HMA, or affiliates, meaning they have substantial control but perhaps not enough to make it a subsidiary. That's the way in which this contract uses the term. That is a fully accepted common usage of the term affiliate, as the authorities on pages 49 and 50 of our brief illustrates, and it avoids the absurdity of this relatively small U.S. subsidiary agreeing to a contract that would have over 1,100 affiliated companies and their expansive definition apply. In addition, when the parties did, through a signed writing, extend this agreement, the language focuses only on HMA and doesn't include any reference. You referred to 1,100 affiliated companies. That means all those 1,100 companies are affiliates. If their argument is accepted, and that's what we're saying is clearly not what was intended by the parties to this contract. Thank you. Thank you. I think Your Honor asked a very salient question, and that was whether WAPACA was told that True North was soliciting on behalf of Hitachi Metals and whether there's anything in the record to reflect that. In fact, they were told that there was a solicitation, that Hitachi Metals was interested in acquiring them. There are e-mails in the record. I'm asking whether that may be definitional as separating out a selected target from a just and ordinary. That's correct, and that is the key distinction between other than the writing requirement. The key distinction is True North was not allowed to solicit any companies other than selected targets. This was a material concern for the parties. Hitachi did not want its business acquisition intentions to be known in public, so they couldn't disclose the name Hitachi Metals, and they could not solicit. But True North did solicit. It either did it because it is a selected target or because it was violating the contract. That's true. Those are the two possible explanations. But if it was a violation of the contract and it was such a material issue, why didn't Hitachi ever object? They were told of these solicitations. They met repeatedly and discussed. In fact, they discussed WAPACA specifically. The Tier 1 lists have annotations by Pete Geide next to the name WAPACA saying, yes, it was not interested. But, again, that was at the time. This unlikely candidate became very viable later on. I'd also like to mention that the idea that Tier 1 is True North's nomenclature is a little bit deceiving. Yes, it was True North's nomenclature, but there's no evidence that HMA did not understand what that meant and agree to it. In fact, Mr. Geide himself wrote the words Tier 1 on version 4 of the selected target list, his own handwriting. And, you know, his evasiveness in his deposition was ‑‑ Well, that could be that he was writing that down because that's an unfamiliar term, but that's the one used by True North, and he wanted to put that in so he could know. So let's say he was learning it for the first time. He was writing, okay, this is the Tier 1 list. That doesn't mean he doesn't understand it. And with respect to the e‑mail evidence, I didn't get to complete my description of the e‑mail evidence. There are several internal e‑mails where Hitachi Metals circulated the version 3 of the Tier 1 list and discussed its contents amongst themselves. And they returned it to True North with an inquiry about one of the other targets, having asked themselves internally whether True North had completed its investigation because they found out Wapaka might be for sale. And here, again, you know, if you allow ‑‑ These writings in themselves are sufficient when taken in conjunction with a six‑page detailed written agreement, not only to satisfy the statute of frauds, but to prove an agreement that Wapaka was a selected target. With respect to version 4. What would show whether True North was an exclusive agent for Hitachi in this quest? The procuring cause doctrine. The agreement by necessary implication. You have a tough row to hoe if you have to be the procuring cause, but you may not have to be. We're not proving. No, we certainly ‑‑ True North brought Hitachi's name to Hitachi early on in the process. The initial list didn't include Wapaka, but then later it did. But the agreement by necessary implication, which is a phrase used in the Morpheus case that Hitachi cited, does mandate that it be interpreted as an exclusive right with respect to selected targets. It says any selected target, upon the acquisition of any selected target. The services required are only those requested by HMA. And there's no dispute that True North fully performed. They did everything they were asked. HMA's witnesses. Yes. And the exclusivity was limited so that it was, in exchange for this exclusivity, it was limited to during the term and a one‑year period thereafter, tail period, and it was limited to selected targets. Thank you. Thank you both. We will reserve decision. This time.